IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | | |
|---|---|---|
| RONNIE TEJADA AND ROSE TEJADA, § | | |
| AS NEXT FRIEND OF K.F.T. AND K.H.T., § | | |
| § | | |
| *Plaintiffs*, § | | Civil Action No. 1:06-CV-351 |
| § | | |
| JEFFERSON COUNTY, DEPUTY JOHN § | | |
| DOE, SHERIFF G. MITCH WOODS, § | | JUDGE RON CLARK |
| NAPHCARE, INC., THE GEO GROUP, INC. § | | |
| AND CORRECTIONAL SERVICES § | | |
| CORPORATION, § | | |
| | | |
| *Defendants*. | | |

**ORDER ON DEFENDANTS MOTION FOR SUMMARY JUDGMENT**

Before the court are the Motions for Summary Judgment of Defendants Jefferson County [Doc. #81], Sheriff G. Mitch Woods [Doc. #82] and Naphcare, Inc. ("Naphcare") [Doc. #86]. Plaintiffs Ronnie Tejada ("Tejada") and Rose Tejada as next friend of K.F.T. and K.H.T. bring suit against Defendants for claims of violations of his Eighth Amendment, violations of 42 U.S.C. § 1983 and the Americans With Disabilities Act, 42 U.S.C. § 12132 ("ADA").

**I. Background**

The following facts are undisputed. Plaintiff Ronnie Tejada was an inmate at the Jefferson County Correctional Facility from November 29, 2004 until October 5, 2005. Naphcare, Inc. had contracted with Jefferson County to provide inmate medical services at the correctional facility. On intake, Tejada informed Naphcare that he suffered from a pre-existing head injury and had cranial plates in his skull.

On December 3, 2004, Tejada reported that his upper and lower teeth were loose and were bothering him badly. After an examination, Naphcare informed Tejada that he had advanced periodontal disease but that no periodontal treatment was available. The only

suggestion offered was to pull his teeth, which Tejada declined.

On December 11, 2004, Tejada informed Naphcare that he had a medical history of diabetes and seizures.

On January 25, 2005, Tejada reported that another inmate had hit him in the head with a basketball and that his head was hurting. On February 18, 2005, Tejada asked Naphcare and Jefferson County to contact his prior neurosurgeon and also his lawyer. He stated, "My injury going on for four weeks." On February 25, 2005, Tejada reported that his head pain was getting worse, that he was blind in his right eye and he was going blind in his left eye.

On March 18, 2005, Tejada requested to see a doctor again on a Jefferson County "cop-out" form. The jail physician and onsite Naphcare medical director referred Tejada to a neurologist, Dr. William High. On April 5, 2005, Dr. High wrote that Tejada was not evaluated because it was an "Inappropriate referral. Should see a neurosurgeon." On May 22, 2005, Tejada asked again to see a neurosurgeon for the pain in his head, stating, "I need my brain surgeon, not a pill." The Naphcare doctor wrote on May 27, 2005, "Request is not possible."

On September 22, 2005, Tejada was transferred to another Jefferson County facility at 1001 Pearl Street, Beaumont, Texas ("the Downtown Jail"), where the GEO Group, Inc. ("GEO") or its predecessor, Correctional Services Corporation ("CSC"), was responsible for the operation of the facility.[1]

In the middle of the night of September 22, 2005, Tejada was pulled from his bunk bed and thrown to the floor by another inmate, hitting the back of his head on a concrete pillar and landing on the concrete floor where he laid unconscious and bled profusely. He went into

---

[1] GEO acquired CSC on November 4, 2005. The acquisition included CSC's management of the Downtown Jail, and GEO assumed all responsibility for claims against CSC arising prior to the date of acquisition

convulsions and seizures. He also urinated and defecated on himself. It took maintenance employees about two hours to open the cell door and Tejada was taken to the CSC infirmary, still bleeding.

On October 5, 2005, Tejada was taken to the emergency room at St. Elizabeth Hospital. He was diagnosed with dehydration, diabetic ketoacidosis, sepsis, pneumonia, and respiratory failure. He was intubated because of significant respiratory distress. The doctors also diagnosed Tejada with liver abscess, acute renal insufficiency, staph infection and septic shock. Tejada's legs were amputated below the knees because of gangrene infection.

## II. Standard of Review

The party moving for summary judgment under Fed. R. Civ. P. 56 has the initial burden of demonstrating that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S. Ct. 2505, 2514 (1986). Movant may show that the undisputed material facts affirmatively establish a right to judgment. Alternatively, movant may establish that the other party has the burden of proof at trial, and has failed to "make a showing sufficient to establish the existence of an element essential to [its] case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2522 (1986).

In order to avoid summary judgment, the party opposing the motion must come forward with competent summary judgment evidence of the existence of a genuine fact issue. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86, 106 S. Ct. 1348, 1335 (1986); *Anderson*, 477 U.S. at 257, 106 S. Ct. at 2514. The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita,* 475 U.S. at 586, 106 S. Ct. at 1356. Fed. R. Civ. P. 56 requires that the nonmoving party set

forth specific facts showing that there is a genuine issue for trial.  *Anderson,* 477 U.S. at 256, 106 S. Ct. at 2514.  Only a genuine dispute over a material fact (a fact which might affect the outcome of the suit under the governing substantive law) will preclude summary judgment.  *Anderson*, 477 U.S. at 248, 106 S. Ct. at 2510.  The dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party on the issue.  *Id.*  If the factual context renders a claim implausible (for example if the claim simply makes no economic sense)  nonmovants "must come forward with more persuasive evidence to support their claim than would otherwise be necessary." *Matsushita*, 475 U.S. at 587, 106 S. Ct. at 1356.

Fed. R. Civ. P. 56(c) requires the court to look at the full record, including the pleadings, depositions, answers to interrogatories, admissions, and affidavits.  But, the court is not going to "sift through the record in search of evidence to support a party's opposition to summary judgment."  *Doddy v. Oxy USA, Inc.*, 101 F.3d 448, 463 (5th Cir. 1996)(citations omitted); *see also* Local Rule CV-56(c) and Appendix 1, ¶ 3 of the Order Governing Proceedings in this case.  All reasonable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion, and any doubt must be resolved in its favor.  *Matsushita*, 475 U.S. at 587, 106 S. Ct. at 1356.  However, only *reasonable* inferences in favor of the nonmoving party can be drawn from the evidence.  *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 468, 112 S. Ct. 2072, 2083 (1992).

### III. 42 U.S.C. § 1983

**A. Claims against Jefferson County and Naphcare**

<u>I. Standard of Review</u>

The events underlying this suit occurred while Tejada was a pretrial detainee. Therefore, Tejada's constitutional rights flows from the due process guarantees of the Fourteenth Amendment rather than from the Eighth Amendment's prohibition against cruel and unusual punishment. *See Colson v. Grohman,* 174 F.3d 498, 504 n. 2 (5th Cir. 1999). However, the Eighth and Fourteenth Amendments impose the same duty on jail and prison officials to provide for the basic safety and well-being of all inmates. *Hare v. City of Corinth,* 74 F.3d 633, 639, 649 (5th Cir. 1996). Although the state has an important interest in the incarceration of pretrial detainees and convicted state prisoners,

> when the State by the affirmative exercise of its power so restrains an individual's liberty that it renders him unable to care for himself, and at the same time fails to provide for his basic human needs-e.g., food, clothing, shelter, medical care, and reasonable safety-it transgresses the substantive limits on state action set by the Eighth Amendment and the Due Process Clause. *DeShaney v. Winnebago County Dept. of Social Servs.,* 489 U.S. 189, 200 (1989).[2]

Accordingly, pretrial detainees and convicted prisoners must establish the same elements of liability to maintain constitutional claims for injuries they received in prison. *Gibbs v. Grimmette,* 254 F.3d 545, 548 (5th Cir. 2001). The constitutional challenges under § 1983 by pretrial detainees must first be classified as either a "condition of confinement" or as an "episodic act or omission." *Flores v. County of Hardeman, Tex.,* 124 F.3d 736, 738 (5th Cir 1997). Only

---

[2]Jefferson County is a governmental entity classified as a "municipality" or "municipal entity" under Texas law. Tex. Civ. Prac. & Rem. § 101.0215(3)(B). It is undisputed that Naphcare performs the same public functions as a municipal entity when providing medical care to prisoners in the jail facilities. It therefore may be sued under 42 U.S.C. § 1983. *See Rosborough v. Management & Training Corp*, 350 F.3d 459, 460-61 (5th Cir. 2003).

the latter is at issue.

Two elements must be proved to satisfy a challenge under § 1983. First, only injuries that implicate a deprivation of "the minimal civilized measure of life's necessities" are considered sufficiently serious. *Id.* This is an objective inquiry. For example, if the claim is based on a failure to prevent harm, the inmate must present facts objectively showing that he was confined "under conditions posing a substantial risk of serious harm." *Farmer,* 511 U.S. at 834. The second element presents alternative requirements, depending on whether the alleged injury resulted from a specific act or omission by a prison official, or from a physical condition of confinement. As to claims based on specific acts or omissions, the detainee must show that the official possessed a sufficiently culpable state of mind. In particular, the Constitution prohibits "deliberate indifference to inmate health or safety." *Id.* Unlike the first element addressing the seriousness of the injury or danger, this element involves a subjective test. Deliberate indifference requires that the official "knows of and disregards an excessive risk to inmate health and safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. Subjective deliberate indifference cannot be inferred from a prison official's failure to act reasonably or failure to alleviate a risk that he did not perceive. *Hare,* 74 F.3d at 649.

To succeed in holding a municipal entity liable in an episodic-act-or-omission case, the plaintiff must also establish that an act or omission resulted from a municipal policy or custom adopted or maintained with objective deliberate indifference to the detainee's constitutional rights. *See Olabisiomotosho v. City of Houston,* 185 F.3d 521, 526 (5th Cir. 1999).

II. Deliberate Indifference

Defendants Naphcare and Jefferson County (collectively, "Defendants") move for summary judgment dismissing Tejada's claim, contending that he cannot establish deliberate indifference of County officials to Tejada's serious medical needs because they amount to non-actionable disagreements with the level or type of treatment.

Tejada's allegations regarding inadequate medical treatment present an act or omission claim. *Hare,* 74 F.3d at 646.  In cases involving medical treatment, the inmate "must show that the officials refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Domino v. Tex. Dep't of Crim. Justice,* 239 F.3d 752, 756 (5th Cir. 2001). Unsuccessful treatment, ordinary acts of negligence, and disagreements with the level or type of treatment do not amount to deliberate indifference. *Estelle v. Gamble,* 429 U.S. 97, 105 (1976).

The undisputed facts in the record disclose the following:

1. Tejada was not provided any insulin, diabetes medicine and/or diabetic diet and exercise for his diabetes. Tejada was given a chocolate shake as part of his medical treatment on October 4, 2005. Naphcare's doctor admitted in his deposition that it is inappropriate to give a chocolate shake to someone suffering diabetes.

2.  Tejada reported loose teeth and/or bleeding gums on December 3, 2005, January 25, 2005, February 27, 2005 and March 29, 2005. Tejada, a pretrial detainee, was diagnosed with advanced periodontal disease, yet was given only the option of either tooth extraction or no medical treatment.

3. Tejada suffered from pre-existing traumatic brain injury and reported pain in his head on January 25, 2005, February 18, 2005, February 25, 2005, March 8, 2005, March 29, 2005 and May 22, 2005. Defendants failed to send Tejada to a neurosurgeon despite a neurologist's medical advice that Tejada "should see a neurosurgeon."

4. After Tejada's injury at the Downtown Jail, where Tejada experienced bleeding, convulsions, seizures and unconsciousness, the only treatment given was Neosporin, gauze and Motrin.  Defendants provided no medical care or follow-up.

5. Tejada was diagnosed with liver abscess, acute renal insufficiency, staph infection, and

septic shock.[3] Tejada developed gangrene infection, resulting in an amputation of both legs below the knees.

There is ample evidence in the record reflecting a complete lack of treatment of Tejada's medical needs, rather than a mere disagreement with the type of treatment. With regard to the dental problems, Defendants state that Tejada was given the opportunity to have his teeth extracted in lieu of treatment for advanced periodontal disease, so the case involves a simple matter of disagreement with the type of treatment. Whether teeth extraction is an adequate alternative to treatment of advanced periodontal disease is a genuine issue of material fact that must be left for the jury to decide.

Defendants contend that Tejada was offered pain medication as a remedy for his head injury and gradual blindness. Naphcare's doctor, Dr. Virgilio Gernale, admitted in his deposition that pain medication is not a proper treatment for blindness. Moreover, Naphcare's nurse, Dyni Brookshire, stated in her deposition that Tejada had informed her that his previous physician specifically directed him not to take pain medication. Having to draw all inferences in favor of plaintiff, the court finds that genuine issues of material fact clearly exist as to whether Defendants' medical treatments amount to deliberate indifference.

III. Policy and Custom

Defendants argue that Tejada cannot demonstrate that there was a policy or custom of deliberate indifference to Tejada's medical needs.

Municipal policy for purposes of section 1983 liability may be found in a policy

---

[3] Although these may have been existing conditions, the medical records show that he was suffering symptoms which went undiagnosed, i.e. yellow discharge, "dense" pain in the right side, rapid weight loss, dehydration, fever, red raised areas on the skin, rash, and inability to urinate. Whether Naphcare's personnel should have been able to diagnose such medical problems is, at a minimum, still in dispute.

statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority. *Johnson,* 379 F.3d at 309. Alternatively, municipal policy under Section 1983 can be a persistent, widespread practice of municipal officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well-settled as to constitute a custom that fairly represents municipal policy. *Id.*

Here, Naphcare's nurse, Dyni Brookshire, stated in her deposition that at the time Tejada was in jail, that the policy was not to check the blood sugar level or monitor the nutrition, exercise and diet of those inmates who were diabetic but not insulin-dependent. In fact, Tejada submitted evidence that two other inmates had died because of diabetes-related diseases.

Nurse Brookshire also made clear that the official policy, custom and practice of Naphcare was to deny treatment of periodontal disease. The health records kept by Naphcare indicates that Tejada suffered from advanced periodontal disease, yet "[periodontal] treatment not available." Exhibit 21 of Plaintiff's Response to Mot for Summary Judgment.

On March 18, 2005, Tejada wrote on a Jefferson County "cop-out" form that he was supposed to be placed on a soft diet, but the soft diet had not been provided. On May 3, 2005, Tejada sent another "cop-out" form stating, "I'm losing too much weight and fast. Please help." Cindy Greene, Jefferson County's contract monitor, first stated in her deposition that a cop-out form would "come to [her]" if it was involved a complaint. Later in the deposition, however, she stated that in the standard practice, she would not see any of the "cop-out" forms filled out by Tejada. Accordingly, the evidence presents a genuine issue of material fact as to whether it was the official custom and policy was to not review the "cop-out" forms. Summary judgment as to Plaintiffs' § 1983 claims against Jefferson County and Naphcare is denied.

**B. Claims against Mitch Woods**

Defendant Mitch Woods' motion for summary judgment raises two issues. First, Woods states that claims asserted against him in his official capacity are redundant because Tejada has already sued the county. Second, Woods contends that to the extent claims are asserted against him in his individual capacity, he has qualified immunity and he had no personal contact with Tejada, and issued no orders or instructions directly related to Tejada individually.

A. Official Capacity

Official capacity suits are merely another way of pleading an action against the entity that employs the individual or agent sued. *Kentucky v. Graham,* 473 U.S. 159, 165-166, 105 S.Ct. 3099 (1985). In all respects but name, an official capacity suit is to be treated as a suit against the entity. *Turner v. Houma Municipal Fire and Police Civil Service Bd.,* 229 F.3d 478, 484 (5th Cir. 2000). The official capacity claims and the claims against the governmental entity essentially merge. *Id.* at 485.

It is undisputed that Tejada has sued Jefferson County alleging the same underlying facts and claims. Therefore, Plaintiffs' official capacity claims against Woods are redundant. As to these claims, Defendant Mitch Woods' motion for summary judgment is granted.

B. Individual Capacity

Officers may also be liable under Section 1983 in their individual capacities for constitutional violations, but are entitled to assert the affirmative defense of qualified immunity. *See, e.g., Roberts v. City of Shreveport*. 397 F.3d 287, 291-92 (5th Cir. 2005). A defendant is entitled to qualified immunity if the defendant's actions were "objectively reasonable" with reference to "clearly established law." *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727 (1982). Evaluating qualified immunity is a two-step process. *Michalik v. Hermann*, 422 F.3d

252, 257 (5th Cir. 2005).  First, the court must determine whether the plaintiff has alleged violation of a clearly established constitutional or statutory right.  *Id.*  Second, if a plaintiff has alleged a violation of a clearly established right, then the court must determine whether the official's conduct was objectively reasonable under the law at the time of the incident.  *Id* at 258.

      Where, as here, an officer has asserted the defense of qualified immunity, "plaintiffs suing governmental officials in their individuals capacities must allege specific conduct giving rise to the constitutional violation."  *Anderson v. Pasadena Indep. Sch. Dist.*, 184 F.3d 439, 443 (5th Cir. 1999).  This heightened pleading standard, distinct from the mere notice pleading standard in Rule 8, requires a plaintiff to plead "with factual detail and particularity, not mere conclusory allegations."  *Id.*; *see also Schultea v. Wood*, 47 F.3d 1427, 1430 (5th Cir. 1995).

      Plaintiffs have only alleged claims against Sheriff Woods as a supervisor.  Under Section 1983, a supervisor may only be held liable in his individual capacity if either of the following exists:  (1) he is personally involved in the constitutional deprivation, or (2) there is a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violations.  *Kohler v. Englade*, 470 F.3d 1104, 1114-5 (5th Cir. 2006).  In a failure to train or supervise context, this requires the plaintiff to show: "(1) the police chief failed to supervise or train the officer; (2) a causal connection existed between the failure to supervise or train and the violation of plaintiff's rights; and (3) the failure to supervise or train amounted to deliberate indifference to the plaintiff's constitutional rights."  *Roberts*, 397 F.3d at 292.

      Plaintiffs have not alleged facts showing that Sheriff Michael was personally involved in a constitutional deprivation, and they have not alleged facts showing a causal connection between any of his conduct and an alleged constitutional violation.  Plaintiffs' allegations only generally state that Sheriff Woods allowed the alleged custom of "unconstitutional mistreatment of

11

chronically ill prisoners" by renewing the contract with Naphcare, and improperly appointed Chief Deputy Duhon to supervise. In the face of Sheriff Woods' assertion of qualified immunity, Plaintiffs are required to allege specific facts, not just general allegations. In particular, Plaintiffs did not allege in detail how the appointment of Chief Deputy Duhon or renewal of the contract with Naphcare caused a violation of Plaintiffs' constitutional rights. The court concludes that summary judgment is granted for Plaintiffs' § 1983 claims against Sheriff Woods.

### IV. Americans With Disability Act

Defendants Jefferson County and Naphcare argue that Tejada presents insufficient evidence of a disability to qualify as an individual protected under the Americans with Disabilities Act ("ADA").[4]

Tejada contends that Defendants violated the Americans with Disabilities Act ("ADA") by denying benefits of services and programs because of his injury in violation of 42 U.S.C. § 12132. The ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. The Supreme Court has held that the ADA applies to prisoners, and that state and local jails are public entities subject to the ADA. *Pennsylvania Dept. of Corrs. v. Yeskey,* 524 U.S. 206, 210-213 (1998). Tejada is required to show that he had an "impairment that substantially limits one or more of the major life activities." 42 U.S.C. § 12102(2)(A).

Tejada has submitted evidence that at the time of the incidents, he was blind in his right eye, had trouble standing and suffered from traumatic brain injury. Given that walking, seeing and learning are clearly major life activities, Tejada's medical evidence raise a genuine issue of

---

[4] Plaintiffs do not assert claims against Defendant Woods for liability under the ADA.

material fact as to whether he is disabled under the ADA. *See* 29 C.F.R. § 1630.2(I) (stating that major life activities can include "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."),

### V. Conclusion

Under these circumstances, Plaintiffs' section 1983 and ADA claims against Jefferson County and Naphcare remain. Naphcare submitted several sections of Ronnie Tejada's deposition in support of its motion for summary judgment. Plaintiffs object to strike these sections because they call for legal conclusions and for speculation. The objections made, and the evidence objected to, do not affect the court's rulings. Plaintiffs' objections, therefore, are denied as moot.

IT IS THEREFORE ORDERED THAT Defendant Jefferson County's Motion for Summary Judgment [Doc. #81] is **DENIED.**

IT IS FURTHER ORDERED THAT Defendant Sheriff Mitch Woods' Motion for Summary Judgment [Doc. #82] is **GRANTED.**

IT IS FURTHER ORDERED THAT Defendant Naphcare, Inc.'s Motion for Summary Judgment [Doc. #86] is **DENIED.**

So **ORDERED** and **SIGNED** this **13** day of **August, 2007.**

_____
Ron Clark, United States District Judge